# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE BENCHMARK GROUP, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENN TANK LINES, INC., | : | NO.  07-2630 |
| | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                April 8, 2009

Currently pending before the Court is a Motion for Summary Judgment by Defendant Penn

Tank Lines, Inc.  For the following reasons, the Motion is granted in its entirety.

## I.        FACTUAL BACKGROUND[1]

Plaintiff The Benchmark Group ("Benchmark") was formed in 1998 and engages in two

lines of business, investment banking and succession planning.  (Pl's Opp. Mot. Summ. J., Ex. A,

Raymond Dep. ("Raymond Dep."), 11:21-12:18, Aug. 18, 2008.)  Stephen Raymond is the

Managing Director of Benchmark.  (Id. at 11:7-20.)  Dean Spear is the President and sole owner.

(Pl.'s Me0m. Opp. Mot. Summ. J., Ex. B., Spear Dep. ("Spear Dep."), 5:13-18, Aug. 22, 2008.)

Defendant Penn Tank Lines, Inc. ("Penn Tank") is a motor carrier corporation operating in

the highly specialized "tank truck" segment of the trucking industry, and provides transportation

services related to the movement of petroleum based products and building materials.  (Def.'s Mot.

---

[1]  The factual history is compiled from an examination of both parties' Statements of Facts and
their accompanying exhibits.  To the extent a fact is disputed, the Court highlights the dispute by
referencing each party's evidence.

Summ. J., Ex. 28, 7.)  It is owned by Jack McSherry, Jack Williams, and Richard Redecker.  (Pl.'s Opp. Mot. Summ. J., Ex. D, Stephen McSherry Dep. ("S. McSherry Dep."), 5:19-25, Aug. 19, 2008.)  Stephen McSherry, Jack McSherry's son, is the chief financial officer.  (Id. at 4:22-25.)

Plaintiff and Defendant entered into a Retainer and Representation Agreement on August 1, 2002, providing that Penn Tank would pay Benchmark a retainer fee in the amount of $5,000 per month, in return for Benchmark's services in identifying both potential suitors of and acquisition targets for Penn Tank.  (Def.'s Mot. Summ. J., Ex. 4.)  The primary purpose of the agreement was for Benchmark to represent Penn Tank in the sale of the company, and to find, identify, and secure a transaction.  (Spear Dep. 14:5-13.)  In addition to the retainer fee, Penn Tank also contracted to pay Benchmark a success fee "upon the closing of a successfully concluded [t]ransaction," which would be calculated based on the total consideration received for the transaction.  (Def.'s Mot. Summ. J., Ex. 4.)

Pursuant to that agreement, Benchmark put together an Offering Memorandum on Penn Tank.  (Pl.'s Opp. Mot. Summ. J., Ex. C, Jack McSherry  Dep. ("J. McSherry Dep."), 17:9-16, Aug. 21, 2008.)  During the 2002-2003 period, Benchmark contacted both private equity investors and strategic purchasers to obtain a potential investment in or purchase of Penn Tank.  (Raymond Dep. 30:11-19.)  Nonetheless, Benchmark was unsuccessful in finding an interested buyer or investor.  (J. McSherry Dep. 18:18-21, 19:10-16; Raymond Dep. 31:25-32:3.)  By May 2003, Penn Tank was having trouble meeting payroll and monthly bills, and, as such, Penn Tank and Benchmark amicably ended the retainer agreement.  (J. McSherry Dep. 18:22-19:4; Raymond Dep. 31:22-24.)

Between May 2003 and December 2005, Raymond of Benchmark "touched base" with Penn Tank intermittently to see if Penn Tank had further need for Benchmark's services.  (Raymond Dep.

33:16-34:19.)  In January 2006, Raymond spoke with Jack McSherry regarding a potential deal with a competitor.  (Id. at 35:21-33:15.)  According to McSherry, Benchmark convinced Penn Tank that Penn Tank's performance was good enough to "test the waters and see what the company could bring, whether it was a majority interest, a minority interest, or whatever."  (J. McSherry Dep. 22:4-9.)  This contact culminated in a meeting of Spear, Raymond, and the McSherrys on January 25, 2006.  (Id. at 24:6-9; Raymond Dep. 36:54-7.)  Raymond recalled Jack McSherry being "in no hurry" to do a deal, but still interested in a recapitalization that would give him liquidity for both personal purposes and company growth.  (Id. at 37:17-23.)  As McSherry did not want to get into another retainer situation, Benchmark agreed to do the work without a fee and get paid "on the back end" if it was able to find a buyer and close a deal that McSherry wanted.  (Spear Dep. 28:4-17.)  The compensation calculation was purportedly outlined in the prior agreement.  (Raymond Dep. 39:21-40:6.)  According to Raymond and Spear, Jack McSherry said he wanted a minimum of five times the value of Penn Tank's earnings before interest, taxes, depreciation, and amortization ("EBITDA").  (Id. at 46:8-20; Spear Dep. 76:17-77:23.)  Further, McSherry required good chemistry with the investor, continuity for the business, and an assurance that he had an equity stake going forward.  (Raymond Dep. 46:21:-47:3.)

Following the meeting, Benchmark began updating and rewriting the Penn Tank Offering Memorandum.  (Spear Dep. 31:2-32:19.)  Notably, however, no contract was prepared to memorialize any of the verbal agreements.  (Raymond Dep. 40:7-40:18; Spear Dep. 28:23-29:2.)  Spear assumed that the old agreement was still operative and had never been terminated, meaning that if Benchmark found a buyer on terms acceptable to the client, it was going to get paid under the formula of the success fee in the prior agreement.  (Spear Dep. 29:4-21.)  Spear further understood

3

that Benchmark was assuming a risk that it would get no fee whatsoever if it could not get a deal that McSherry wanted.  (Id. at 28:18-22.)  McSherry, on the other hand, believed that Benchmark was simply assessing the worth of the company in the market, as opposed to actually accomplishing the taking in of an equity partner.  (J. McSherry Dep.  53:21-54:6.)

Around the time that Benchmark was soliciting Penn Tank, National Penn Bank ("the Bank") was doing the same with respect to taking over Penn Tank's banking services from Bank of America.  (Def.'s Mot. Summ. J., Ex. 14.)  On January 17, 2006, Kirk Soxman, Bruce Smith, and Jon Swearer of National Penn Bank met with Steve McSherry and Jack McSherry to discuss the history, business, and banking needs of Penn Tank.  (Id.)  The Bank completed a cash management analysis and sought information regarding Penn Tank's financial goals.  (Id. Ex. 15.)  On May 4, 2006, the Bank provided a letter setting forth proposed terms for extending a $2 million line of credit to Penn Tank in order to refinance some of Penn Tank's equipment.  (Id. Ex. 16.)  The letter was for discussion purposes only and not a commitment to lend.  (Id.)

Pursuant to the January 2006 verbal agreement, Benchmark engaged in a targeted analysis of companies that might meet McSherry's criteria and, by the fall of 2006, had a list of less than a dozen private equity groups.  (Raymond Dep. 55:2-56:13.)  On June 13, 2006, Raymond wrote to Jack McSherry about some items scheduled for their June 16, 2006 meeting, and informed Penn Tank about a private equity investment firm, named the Weatherly Group – a company that had originally expressed interest in Penn Tank in 2003 and which was a candidate for a recapitalization deal.  (Def.'s Mot. Summ. J., Ex. 17; Raymond Dep. 57:11-18; 58:10-59:4.)  Multiple conversations ensued between Penn Tank and the Weatherly Group, culminating in both a verbal and a written letter of intent, which Benchmark turned over to Penn Tank.  (Raymond Dep. 59:9-63:9; Pl.'s Opp.

Mot. Summ. J., Ex. F.)  Ultimately, the McSherrys met with Benchmark and the Weatherly Group

on June 16, 2008, but Penn Tank was not as excited about the written proposal, which called for an

asset sale, as the verbal proposal, which called for a valuation and purchase of stock.  (Raymond

Dep. 63:14-64:15.)

       In the meantime, discussions continued between Penn Tank and National Penn Bank.  On

June 28, 2006, Steve McSherry e-mailed Kirk Soxman both to update him about Penn Tank's

potential movement of its banking lines and to inquire about possibly obtaining some capitalization

from the Bank, which would provide liquidity in the business, while maintaining both internal

structure and internal family succession.  (Def.'s Mot. Summ. J., Ex. 18.)  Steve noted, however,

that he was simply "reaching out for feedback" and that nothing might transpire during the first year

of the banking relationship.  (Id.)  On July 14, 2006, Steve McSherry met with Kirk Soxman and

Bruce Smith to discuss the consolidation of Penn Tank's sister company, Genesis, into Penn Tank,

as well as Jack McSherry's plans to create trusts for his children.  (Id.; Def.'s Mot. Summ. J., Ex.

19.)  The "desk-top appraisal" of the company showed considerable equity in the company's

equipment.  (Id.)  On August 21, 2006, Soxman provided Penn Tank with a Proposed Term Sheet

for a credit facility of up to $12,073,762.08, consisting of a revolving loan commitment of up to

$5,000,000.00, L/C line of $2,000,000.00, leasing line of $3,000,000.00, and for a refinance of the

existing term loan of $2,073,762.08.  (Def.'s Mot. Summ. J., Ex. 20.)  This proposal would provide

liquidity to allow distribution of cash to shareholders.  (Def.'s Mot. Summ. J., Ex. 21, Soxman Dep.

("Soxman Dep."), 115:3-116:23, Sep. 8, 2008.)  Penn Tank delayed on the proposal, however, to

avoid penalties from early termination with Bank of America.  (S. McSherry Dep. 13:5-23.)

Penn Tank had a second meeting with Benchmark and the Weatherly Group in the fall of 2006.  (Raymond Dep. 62:21-63:13.)  Weatherly gave a proposed valuation of $33 million for an asset deal, which was at least five times EBITDA, possibly better.  (Id. at 66:18-20; 67:3-12.)  The valuation for the stock deal was below five times EBITDA.  (Id. 67:13-22; Def.'s Mot. Summ. J., Ex. 24.)  Eventually, the Weatherly proposal "died on the vine" without any formal rejection by Penn Tank.  (Raymond Dep. 67:23-68:9.)  Penn Tank did not accept the offer because Jack McSherry did not feel that they were serious and noted that the stock deal was valued lower than an asset deal.  (J. McSherry Dep. 57:22-5:13.)  Raymond conceded that Penn Tank did not owe Benchmark any success fee in connection with the Weatherly transaction because the deal did not close.  (Raymond Dep. 68:10-17.)

In the fall of 2006, Benchmark began communications with Linx Partners on behalf of Penn Tank.  (Id. at 70:14-17.)  Following a meeting between Penn Tank and Linx Partners, on October 26, 2006, Linx provided a written proposal to purchase Penn Tank's stock at $23 to $26 million, which was considerably below the parameters of five times EBITDA that Jack McSherry had originally outlined.  (Id. at 75-80; Def.'s Mot. Summ. J., Ex. G.)  In addition, Jack McSherry was not comfortable with Peter Hicks, Linx's Managing Partner, and would "never get into bed with [him]." (J. McSherry Dep. 62:7-19.)  After the meeting, Penn Tank had no further interest in Linx, and Benchmark understood that.  (Id. at 62:24-63:2.)  Benchmark did not even forward Linx's written indication of interest to the McSherrys and, instead summarized it in an e-mail.  (Def.'s Mot. Summ. J., Ex. 34.)

By October 30, 2006, Benchmark provided a revised, updated Confidential Offering Memorandum to Penn Tank.  (Def.'s Mot. Summ. J., Ex. 28.)  Raymond knew that Benchmark

would not be compensated for this book.  (Raymond Dep. 49:22-50:2.)  He noted that this document was very similar to the original Offering Memorandum prepared back in 2002, but that there was new material, including updated financial information, updated customer information, and information about specific employees.  (Id. at 50:15-51:22.)  Spear, however, commented that the book presented a different landscape, different company, and different performance, and, thus, was essentially a new book.  (Spear Dep. 31:2-16.)

In December 2006, Benchmark sought to introduce Penn Tank to another private equity group by the name of Crystal Ridge Partners ("Crystal Ridge").  (Def.'s Mot. Summ. J., Ex. 39.)  At this point, Jack McSherry was becoming more "reticent" about selling a majority equity position in the company because his second son was coming into the business in January.  (J. McSherry Dep. 73:11-15.)  If, however, there was a "wow factor" out there, he would be willing to take another look at it.  (Id. at 73:15-17.)  Up to this time, McSherry understood that Benchmark was willing to work without compensation until they found a proper offer.  (Id. at 74:8-21.)  As such, a meeting between Benchmark, Penn Tank, and Crystal Ridge was scheduled on December 14, 2006, with John "Jack" Baron, the Managing Partner of Crystal Ridge, and Brian Toolan, Managing Director of Crystal Ridge.  (Def.'s Mot. Summ. J., Ex. 39.)  During the meeting Crystal Ridge asked Raymond for additional information about Penn Tank, the majority of which was provided by Penn Tank. (Raymond Dep. 132:6-18.)

Via an e-mail dated January 12, 2007, McSherry asked Benchmark to explore Crystal Ridge's "appetite for a minority stake in the new company."[2]  (J. McSherry Dep. 96-97:16.)  Both

---

[2]  Defendant points to its Exhibit 42 for the fact that Jack McSherry asked Raymond to explore Crystal Ridge's "appetite for a minority stake in the new combined company."  Most likely due to mere clerical error, Exhibit 42 is an unrelated memorandum from the Weatherly Group.

Spear and Raymond, however, indicated the unlikelihood of any company they were talking to being interested in a minority position.  (Id. at 98:15-25; Raymond Dep. 99:2-22.)  Jack McSherry recalled that, during the time period between September and December 2006, he told Benchmark that bank financing or refinancing was an option as an alternative to taking on an equity investment.  (J. McSherry Dep. 43:20-44:7, 44:24-45:21.)  Nonetheless, Raymond, Spear, and the McSherrys planned to meet again with Crystal Ridge on January 30, 2007.  (Def.'s Mot. Summ. J., Ex. 46.)  At that point, Crystal Ridge had given a verbal commitment that if they could buy into and understand a growth plan, they would propose an offer figure between a five and six multiple of Penn Tank's EBITDA.  (Id. Ex. 47.)  This figure "tweaked" Jack McSherry's interest and brought him closer to the "wow" number.  (J. McSherry Dep. 119:14-20.)

After a series of meetings, Crystal Ridge gave Benchmark a written proposal, offering $31,500,000 for Penn Tank, which was five times the EBITDA for calendar year 2006.  (Pl.'s Opp. Mot. Summ. J., Ex. H.)  Notably, the Crystal Ridge letter of intent was unsigned and explicitly stated that it was neither a binding agreement or offer.  (Id.)  John R. Baron of Crystal Ridge further testified that even if the letter had been signed, it would not have obligated Crystal Ridge to close on the transaction, since the deal was subject to many conditions precedent in the valuation of due diligence, obtaining financing, and equity investment.  (Def.'s Mot. Summ. J., Ex. 57, Baron Dep. ("Baron Dep."), 20:5-21:23, Sep. 5, 2008.)  As a general practice, Crystal Ridge typically issued six to ten letters of interest or letters of intent a year and, on average, closed on only two.  (Id. at 82:10-16.)

Up until this time, there was no written agreement between Benchmark and Penn Tank Lines for the fees to be paid to Benchmark.  Given the pending Crystal Ridge offer, the parties sought to

reduce their January 2006 verbal understanding to writing.  Spear and Raymond prepared an

agreement (the "Agreement"), dated February 7, 2007, indicating that Benchmark would provide

various services in connection with the marketing, negotiation, and ultimate sale of all or a

significant part of Penn Tank.  Penn Tank, for its part, agreed to:

> retain Benchmark as its exclusive agent to render the Services; to provide Benchmark
> with all relevant information; to advise Benchmark promptly of all contacts and
> proposals from prospective purchasers; to use commercially reasonable efforts to
> cooperate with Benchmark in its providing the Services; to provide Benchmark
> access to and the cooperation of [Penn Tank]'s employees and agents whose
> assistance is requested by Benchmark; and to provide Benchmark with all financial
> and other information requested by it for the purpose of rendering the Services.

(Pl's Opp. Mot. Summ. J., Ex. I.)  In addition, the Agreement stated that Benchmark would be

reimbursed as follows:

> Success Fee.  [Penn Tank] agrees to pay Benchmark a success fee (the "Success
> Fee") in US dollars payable in cash or wire transfer upon the closing of a
> Transaction.  Pursuant to this Paragraph 7, the Success Fee shall be calculated based
> on the total amount of the consideration cumulatively paid and delivered in a
> Transaction, including but not limited to, payments made subsequent to the closing
> ("Total Consideration").  Total Consideration paid to [Penn Tank], its affiliates or
> shareholders shall include, but is not limited to, the following: moneys or cash; the
> fair market value of any securities issued (including, without limitation, any joint
> venture interest delivered to, or retained by, [Penn Tank]); real or personal property;
> the principal amount of any promissory note or other debt instruments; the principal
> amount of any liabilities or obligations to financial institutions assumed. . . .  Total
> Consideration shall not include compensation for the fair value of future services to
> be rendered by management shareholders. [Penn Tank] and Benchmark agree that
> any fee payable hereunder with respect to a Transaction will be computed as if all the
> then outstanding equity interests of [Penn Tank] on a fully diluted basis (including
> options) were acquired in such Transaction at a price per share or unit equal to the
> price paid per share or units of the equity interest in such Transaction.
>
> •   For a Transaction with Total Consideration less than or equal to $25 million,
>     the Success Fee shall be 2% of the Total Consideration.
>
> •   For a Transaction with Total Consideration greater than $25 million[,] the
>     Success Fee shall be $500,000 plus 5% of the Total Consideration in excess
>     of $25 million.

The Success Fee is due and payable on the date of Closing.  In the event that the
terms of the financing commitment permit delayed or staged drawdowns of funds
(i.e., working capital or capital expenditure lines) by the Company, Benchmark's full
Success Fee shall be due and payable on the date of Closing, whether or not any
funds are fully or partially drawn down by the Company at such Closing.

(Id.)  Finally, the Agreement provided for Benchmark to be reimbursed for reasonable out-of-pocket

expenses upon invoice of Penn Tank by Benchmark, "if approved in advance."  (Id.)  Jack McSherry

indicated that he wanted to include a provision for a fee structure on a minority deal. (Def.'s Mot.

Summ. J., Ex. 51.)  Via an Addendum Letter, dated February 22, 2007, Benchmark agreed to credit

the Total Success Fee by fifty percent of the Success Fee attributable to the "rollover equity," which

"is defined as the amount of equity that the current shareholders invest in a newly formed company

to recapitalize Penn Tank Lines."  (Pl.'s Opp. Mot. Summ. J., Ex. I.)  McSherry still questioned the

fee structure if somebody only bought 49% of the Penn Tank.  (Def.'s Mot. Summ. J., Ex. 54.)

Without any clear resolution of this issue, however, both parties signed the Agreement and

Addendum Letter on February 23, 2007.  (Pl.'s Opp. Mot. Summ. J., Ex. I.)

Only after the Agreement was executed did Benchmark show Penn Tank the Crystal Ridge

proposal.  (J. McSherry Dep. 87:12-88:2; Def.'s Mot. Summ. J., Ex. 56.)  Upon review of the

Crystal Ridge letter of intent, Penn Tank identified to Benchmark seven issues that it wanted to

address with Crystal Ridge, all of which Benchmark agreed to raise.  (Pl.'s Opp. Mot. Summ. J., Ex.

J.)  Although Steve McSherry believed Benchmark managed to successfully resolve each of the

seven issues to Penn Tank's satisfaction, (S. McSherry Dep. 105:23-113:2.), both Raymond and

Baron indicated that all of these issues would still be subject to future negotiations between the

parties and no resolution was included in any written letter of intent.  (Raymond Dep. 180:12-187:6;

Baron Dep. 65-75.)  In addition, as noted by Raymond, Benchmark purportedly got Crystal Ridge to

verbally raise the offer by a million dollars.  (Id. 107:17-23; Raymond Dep. 113:8-114:2.)  Baron

noted, however, that if there had been any agreement to raise the price, it would have likely been

reflected in a new letter of intent.  (Baron Dep. 83:7-25.)

On March 8, 2007, Jack McSherry contacted Kirk Soxman and Bruce Smith of Penn

National Bank to inform them that he recently received a letter of intent from Crystal Ridge for

roughly five times EBITDA, with McSherry retaining 37%.  (Def.'s Mot. Summ. J., Ex. 65.)

McSherry explained that he had "pretty much decided he wants to do something internally relative to

a liquidity event.  He wants to see the business continue in the family and exercising the [Crystal

Ridge offer] would have a high likelihood of that not happening."  (Id.)  Soxman interpreted

McSherry's statements to mean that he had yet to make a definitive decision.  (Soxman Dep. 120:23-

121:17.)

Although Jack McSherry ultimately believed the Crystal Ridge offer was a fair offer as a

majority deal, (J. McSherry Dep. 127:20-128:5), he continued to vacillate on what to do.  (Raymond

Dep. 109:16-17.)  Both Raymond and Spear recall Jack McSherry indicating to them that

Benchmark did a great job to get him what he wanted and that he would pay or give a "fee" to

Benchmark regardless of whether he went through with the deal or not.  (Spear Dep. 59:14-60:13;

Raymond Dep. 109:10-110:19.)  McSherry did not specify what type of compensation he meant or

what type of fee he felt he owed.  (Id.)  At no point, however, did McSherry feel legally obligated to

pay.  (J. McSherry Dep. 150:16-20.)

In mid to late March, Benchmark informed Baron that Jack McSherry was not excited about

signing the deal, and encouraged Baron and McSherry to have dinner and discuss whether or not

McSherry was still interested.  (Baron Dep. 94:17-95:5.)  The two met on April 4, 2007, at which

time McSherry indicated that he was not sure that he wanted to go with a majority sale, and may instead want to pursue either a minority deal or bank financing.  (Id. at 95:6-96:12.)  The following day, Baron wrote to several of his colleagues that he believed the odds were 50/50 that McSherry would close the deal with Crystal Ridge and felt that there was a "better shot at a minority deal." (Def.'s Mot. Summ. J., Ex. 72.)

On April 9, 2007, Steve McSherry, with his father's express permission, gave the confidential Offering Memorandum prepared by Benchmark to National Penn Bank.  (Id. Ex. 73; S. McSherry Dep. 14:11-15:23.)  With the Offering Memorandum in hand, Soxman began preparing an Underwriting Analysis for National Penn Bank's Commercial Credit Committee seeking approval of several new loan facilities to Penn Tank, totaling up to $15 million, which would allow Penn Tank to make a $6 million distribution to shareholders.  (Soxman Dep. 58:2-21.)  The Underwriting Analysis copied verbatim much of the language from the confidential Offering Memorandum. (Soxman Dep. 41:5-25; Pl.'s Opp. Mot. Summ. J., Ex. M.)  Additionally, the Underwriting Analysis specifically referenced the Benchmark-negotiated Crystal Ridge offer, as follows:  "[Penn Tank] has been approached by numerous equity sponsors and currently has an offer from Crystal Ridge Partners for 5.25 x EBITDA.  This is considered a very good offer for the industry and equates to an enterprise value of $32 MM."  (Pl.'s Opp. Mot. Summ. J., Ex. M, 15.)  The application to the Credit Committee was submitted on April 11, 2007, and approved on April 13, 2007.  (Def.'s Mot. Summ. J., Ex. 74.)  National Penn Bank sent the McSherrys a commitment letter on April 16, 2007.  (Id. Ex. 75.)

Upon receipt of National Penn Bank's term sheet, Jack McSherry sent a copy of the competing proposal to Benchmark, who in turn forwarded it to Crystal Ridge.  (Id. Exs. 76-77.)

Raymond and Jack McSherry met on April 23, 2007 to discuss this outstanding proposal, at which time McSherry indicated that he did not want to sell a majority interest in the company and asked whether Crystal Ridge would make a proposal to become a minority investor in Penn Tank Lines. (Raymond Dep. 100:10-25.)  Through further negotiations, Benchmark persuaded Crystal Ridge to submit a new, written proposal, dated April 25, 2007, for the purchase of a minority interest in Penn Tank.  (Pl. Opp. Mot. Summ. J., Ex. K.)  This offer called for Crystal Ridge to invest $7.5 million in Penn Tank in exchange for convertible preferred stock in the company.  (Id.)

On May 11, 2007, Penn Tank, upon evaluation of both National Penn Bank's proposal and the Crystal Ridge offer, e-mailed Crystal Ridge to formally turn down their offer and thank them for their time.  (Def.'s Mot. Summ. J., Ex. 79.)  Jack McSherry advised Soxman of his intent to move Penn Tank's banking business to National Penn Bank.

On May 16, 2007, Benchmark sent Jack McSherry a letter demanding a success fee, calculated based on the proposal contained in Crystal Ridge's initial letter of intent, in the amount of $814,423.  Specifically, the letter stated, in part:

> In short, we delivered the price that exceeded the one that you wanted; we preserved family ownership and participation; and we achieved a structure that met your tax planning goals.  We could not and would not have achieved this result for our client without significant effort, for which to date we have received no compensation and been paid no expenses.  We would not have undertaken this effort had we not had a contract between us which provides that we be paid for our work if we delivered the results you asked us to deliver.  We now seek payment for those results.  The risk that we bore was that we would not deliver a buyer that met your needs – not that once we delivered that buyer after fifteen months of compensation-free work, you would suddenly change your mind.
>
> * * *
>
> We respect [your position to keep the business for your sons] on a personal level, and nobody can force you to sell your company if you do not want to sell it.  That, however, does not displace our entitlement to a fee and your obligation to pay it.  Notwithstanding your change of heart, Benchmark has done everything you have

asked and delivered to PTL exactly what you assigned us to do.  That result activates the payment provision of our contract dated February 7, 2007 and as amended on February 22, 2007 (the "Contract"), which entitles us to a Success Fee of 2% of the total consideration of the Transaction up to $25,000,000, and 5% of the total consideration in excess of $25,000,000, less a rollover credit as provided in the Contract's amendment.

(Id., Ex. 80.)

Via letter dated June 4, 2007, Penn Tank, through its counsel, responded that:

[Benchmark's] services were provided without any indication by [Penn Tank] or request by you as to what would be an acceptable price, structure, terms and conditions, and without any commitments, directives or parameters from or on behalf of my client.  It was merely to determine whether there were Targets that would submit offers that would be considered for acceptance.

Your subsequent letter of May 16, 2007 claiming compensation in connection with the services you rendered based upon the Success Fee, as defined in the previous letter, is unsupported by any of the facts or legal principles.  As stated in the previous paragraph, nowhere does the original letter state that my client had set the parameters for an acceptable offer.  That letter also clearly states that the Success Fee is due and payable on the date of closing; thus meaning that if there is no acceptable offer and thus no closing, there is no Success Fee.  It was based upon an arrangement that you solicited and persuaded my client to pursue.

(Id. Ex. 81.)  At the close of the letter, Penn Tank rejected the claim for payment of the success fee, rescinded any prior verbal offer to reimburse expenses, and terminated the February 7, 2007 contract between the parties.  (Id.)

## II.   PROCEDURAL HISTORY

Benchmark initiated this litigation against Penn Tank on June 22, 2007, claiming breach of contract (Count I), *quantum meruit* (Count II), and promissory estoppel (Count III).  Penn Tank initially filed a motion to dismiss the entirety of the Complaint, which the Court, by way of Order dated January 30, 2008, denied with respect to the breach of contract count, but granted with respect to the claims under promissory estoppel and *quantum meruit*.  The Benchmark Group, Inc. v. Penn

Tank Lines, Inc., Civ. A. No. 07-2630, 2008 WL 282694 (E.D. Pa. Jan. 30, 2008).  Thereafter, in

April 2008, Plaintiff sought leave to file an Amended Complaint.  The Court permitted the requested

expansion of the breach of contract count to include allegations of breach of the covenant of good

faith and fair dealing, but declined to allow both the addition of an alternative *quantum meruit* claim

and the pleading of a separate claim for breach of the covenant of good faith and fair dealing claim.

The Benchmark Group, Inc. v. Penn Tank Lines, Inc., Civ. A. No. 07-2630, 2008 WL 2389463

(E.D. Pa. Jun. 11, 2008).  In connection with that Order, Plaintiff filed its Amended Complaint on

June 26, 2008.

On October 20, 2008, Defendant filed the current Motion for Summary Judgment, seeking

judgment on the entire Amended Complaint.  Per the parties' stipulations, Plaintiff responded on

December 31, 2008, and Defendant filed its Reply Brief on January 27, 2009.  Plaintiff submitted a

Sur-reply Brief on February 26, 2009.

## III.    STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P.

56(c).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-

finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide

which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pa,

139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc.,

998 F.2d 1224, 1230 (3d Cir. 1993). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## IV.   DISCUSSION

In the pending Motion for Summary Judgment, Defendant seeks dismissal of all claims raised in Plaintiff's Amended Complaint. First, Defendant challenges Plaintiff's claim to a success fee under the parties' contractual Agreement. Second, Defendant asserts that Plaintiff has failed to

produce any evidence of bad faith conduct by Penn Tank.  Finally, Defendant avers that Plaintiff has

no entitlement to attorneys' fees.  The Court considers each argument individually.

A.   **Whether Penn Tank Owes a Success Fee to Benchmark Under the Express Terms of the Agreement**

Defendant's first argument contends that, pursuant to the express terms of the Agreement

between Penn Tank and Benchmark, Defendant owes no success fee to Plaintiff because no

transaction closed.  Plaintiff's response is two-fold.  Primarily, it asserts that its right to a

commission or "success fee" was earned upon production of a ready, willing, and able buyer and

was not expressly conditioned on the consummation of an actual sale.  Alternatively, Plaintiff

contends that even if the contract so had conditioned its right to a commission, Defendant

unilaterally prevented the condition from occurring and, thus, is estopped from relying on it.

Construing the contract pursuant to Pennsylvania law, the Court agrees with Defendant and, as such,

grants summary judgment on this claim.

1.   **Whether the Closing of a Transaction is a Condition Precedent to Benchmark's Right to a Success Fee**.

As a threshold matter, "[t]he task of interpreting a contract is generally performed by a court,

rather than by a jury. . . . [t]he goal of that task is, of course, to ascertain the intent of the parties as

manifested by the language of the written instrument."  Standard Venetian Blind Co. v. Am. Empire

Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (internal citations omitted).  "The intent of the parties is to be

ascertained from the document itself when the terms are clear and unambiguous."  Hutchison v.

Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986).  Thus, "a contract that is unambiguous on its

face must be interpreted according to the natural meaning of its terms, unless the contract contains a

latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct

interpretation." Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 96 (3d Cir. 2001).

Notably, however, "a claim of latent ambiguity must be based on a 'contractual hook': the proffered

extrinsic evidence must support an alternative meaning of a specific term or terms contained in the

contract, rather than simply support a general claim that the parties meant something other than what

the contract says on its face." Id. "In other words, the ambiguity inquiry must be about the parties'

'linguistic reference' rather than about their expectations." Id.; see also Whole Enchilada, Inc. v.

Travelers Prop. Cas. Co. of Am., 581 F. Supp. 2d 677, 689 (W.D. Pa. 2008) ("The polestar of our

inquiry . . . is the language of the insurance policy. . . . [A]n ambiguity does not exist simply because

the parties disagree on the proper construction." (internal quotations omitted)).  In cases where the

wording is ambiguous, relevant extrinsic evidence should be considered to resolve the ambiguity.

12th Street Gym, Inc. v. Gen. Star Indem., 980 F. Supp. 796, 801 (E.D. Pa. 1997).  "When such

evidence does not resolve the dispute, the policy provision is to be construed in favor of the insured

and against the insurer as the drafter of the agreement."  Id. (citations omitted).

Pennsylvania's general and well-established rule for interpreting a brokerage contract

provides that a broker becomes entitled to his commission "when he or she presents a purchaser who

is ready, willing and able to purchase the property upon terms satisfactory to the seller."

Zitzelberger v. Salvatore, 458 A.2d 1021, 1022 (Pa. Super. 1983) (citing inter alia In re Dixon's

Estate, 233 A.2d 242, 244 n.2 (Pa. 1967)).  It is equally well-settled, however, that the parties have

the right to create their own contract terms modifying this general rule.  Shumaker v. Lear, 345 A.2d

249, 251 (Pa. Super. 1975).  Thus, "[i]f the parties expressed their intention to make the commission

contingent or conditional, such as by requiring an actual sale, . . . the broker does not earn his

commission until the condition or contingency has been satisfied."  Id. (citing Sork v. Rand, 222

A.2d 890 (Pa. 1966)); see also Dixon, Appellant v. Andrew Title & Mfg. Co., 357 A.2d 667, 669

(Pa. 1976) ("If the agreement between the parties provides that the broker is not entitled to his

commission until a condition is performed, then the broker has no claim to his commission until that

condition is satisfied.").  "Whether a contract contains a condition, the nonfulfillment of which

excuses performance, depends upon the intent of the parties to be ascertained from a fair and

reasonable construction of the language used in light of all the surrounding circumstances when they

executed the contract."  Feinberg v. Auto. Banking, 353 F. Supp. 508, 512 (E.D. Pa. 1973) (citing

Williston on Contracts, § 666 (3d ed. 1961); 8 P.L.E. Contracts § 263 (1971)).

As noted above, the primary issue before the Court is whether the Agreement between the

parties conditioned Benchmark's entitlement to Success Fee upon the closing of a Transaction or

whether Benchmark's production of a ready, willing, and able buyer via the Crystal Ridge Letter of

Intent was sufficient to earn payment.  The Agreement states, in pertinent part:

> [Penn Tank] agrees to pay Benchmark a success fee (the "Success Fee") in US dollars
> payable in cash or wire transfer *upon the closing of a Transaction*.  Pursuant to this
> Paragraph 7, the Success Fee shall be calculated based on the total amount of the
> consideration cumulatively paid and delivered in a Transaction, including but not
> limited to, payments made subsequent to the closing ("Total Consideration"). . . .
> * * *
>
> The Success Fee is due and payable on the date of Closing.  In the event that the
> terms of the financing commitment permit delayed or staged drawdowns of funds
> (i.e., working capital or capital expenditure lines) by the Company, Benchmark's full
> Success Fee shall be due and payable on the date of Closing, whether or not any
> funds are fully or partially drawn down by the Company at such Closing.

(Pl's Opp. Mot. Summ. J., Ex. I (emphasis added).)  A plain reading of this provision clearly

indicates that a Success Fee is due "upon the closing of a Transaction."  The language is

unambiguous and no convoluted interpretation is either required or permissible.  Benchmark, a

19

sophisticated commercial entity, as well as the drafter of the Agreement, expressly conditioned its payment upon completion of a transaction.  Absent such a transaction, the Agreement does not provide for any payment.

Notwithstanding the facial clarity of this language, Plaintiff contends, on two separate but complementary bases, that nothing in this provision creates any condition precedent to a success fee. First, it argues that, under the law, a broker's right to a commission is not conditioned on consummation of an actual sale unless the parties' contract unequivocally and unmistakably so provides.  (Pl's Opp. Mot. Summ. J. 12 (citing Freiwald v. Fid. Interstate Cas. Co., 138 A.2d 146, 148 (Pa. 1958) (although parties may enter an express agreement that a broker shall not be entitled to a commission unless a stipulated condition has been fulfilled, that condition "must be so stipulated categorically in unmistakable terms.")).)  It goes on to reason that the language of the Agreement in this case is not clear enough to create a contingency and, thus, cannot be considered by the Court as such.

While the basic legal premise of Plaintiff's argument is correct – i.e. that a contract must show that the parties intended a condition – its analysis fails to recognize the fundamental principle that "[i]n making a promise expressly conditional, contracting parties need not use any particular words."  Nat'l Prods. Co. v. Atlas Fin. Corp., 364 A.2d 730, 734 (Pa. Super. 1975) (quoting RESTATEMENT (CONTRACTS) § 258 and cmt. a (1932)).  "On the contrary, . . . an intention to make a promise conditional may be manifested by the general nature of a promise or agreement, as well as in more formal ways, and if so manifested the condition is express."  Id.; see also Allegheny County v. Maryland Cas. Co. 32 F. Supp. 297, 300 (E.D. Pa. 1940) ("'Any words will create a condition which express, when properly interpreted, the idea that the performance of the promise is dependent

20

on some other event.  No particular form of words is necessary in order to create an express

condition. Whether a promise is expressly conditional, and if so what is the nature of the condition,

depend upon interpretation.'") (quotations omitted).  Although an act or event designated in a

contract will not be construed as a condition precedent unless that clearly appears to have been the

parties' intentions, the court must apply general rules of contract interpretation and the intention of

the parties is controlling.[3]  Beaver Dam Outdoors Club v. Hazleton City Auth., 944 A.2d 97, 103

(Pa. Commw. 2008).

      The language of the Agreement, which states that the success fee is due "upon the closing of

a Transaction," clearly mandates the closing of a transaction as a condition precedent to

Benchmark's entitlement to payment.[4]  See Feinberg, 353 F. Supp. at 513 (noting that contractual

language providing broker a finder's fee from borrower "upon receipt" of funds from the lender, and

reference to payment "at settlement" contemplated that there would be a settlement and, thus, a

consummated loan prior to the earning of a commission); L.B. Kaye Assoc., Ltd. v. Jews for Jesus,

677 F. Supp. 160, 164 (S.D.N.Y. 1988) ("[L]anguage in a brokerage agreement [indicating that a

commission is to be paid upon the closing of title] imports also the notion that closing of title is a

---

[3]  In its Sur-reply Brief, Plaintiff characterizes this rule as a "presumption" that an event is not a
condition unless the parties' intent to make it so is specified in clear and unmistakable language.
(Pl.'s Sur-reply Br. 2.)  In reality, the rule is that, "[w]hile the parties to a contract need not utilize
*any* particular words to create a condition precedent, an act or event designated in a contract will not
be construed as constituting one unless that clearly appears to have been the parties' intention."
Acme Mkts., Inc. v. Fed. Armored Exp., Inc., 648 A.2d 1218, 1220 (Pa. Super. 1994).  Accordingly,
a party seeking to prove the existence of condition precedent need not necessarily rebut any
presumption, but must merely show, under general rules of contract interpretation, that the parties
intended to include a condition precedent in their contract.  While seemingly semantical in nature,
this distinction places a lower burden on the proving party.

[4]  Plaintiff's citation to cases from New York and Florida courts finding different language
sufficient to create conditions precedent to a commission does not operate to the exclusion of the
language used by the parties in the Agreement at issue.  (See Pl.'s Opp. Mot. Summ. J. 13 n.3.)

condition precedent to the broker's being entitled to a commission.") (quoting <u>Levy v. Lacey</u>, 239

N.E.2d 378, 380 (N.Y. 1968)).  Plaintiff was not required to use specialized language and, in fact, no

other reasonable construction of the disputed provision is logical under the plain meaning of the

words

      The Court's interpretation is further bolstered by the context of the provision at issue.

According to the Agreement, the Success Fee is calculated as a percentage of "total amount of the

consideration cumulatively paid and delivered in a transaction, including but not limited to,

payments made subsequent to the closing ('Total Consideration')."  (Pl.'s Opp. Mot. Summ. J., Ex.

I.)  A logical interpretation of this statement would mean that if no cash, securities, or other

"consideration" are exchanged between Penn Tank and any buyer, then the Total Consideration is

zero.  Any percentage of zero Total Consideration leaves a zero Success Fee.

      Such a formula properly effectuates the intent of the parties, particularly in this case where

the letter of intent issued by Crystal Ridge was neither a binding agreement or offer.  (Pl.'s Opp.

Mot. Summ. J., Ex. H.)  The offer did not obligate either party to close on the transaction, as the deal

was subject to many conditions precedent and the precise amount of the offer had yet to be finalized.

(Baron Dep. 20:5-21:23, 65-75, 83:7-25.)  The absence of any firm amount provides no clear basis

on which to calculate any Success Fee.  The fact that Plaintiff, as drafter of the contract, chose to

base the amount of its compensation upon the Total Consideration changing hands, as opposed to

some alternative formula, suggests that it intended a transaction to be a condition precedent to

payment.

Finally, although we need not resort to extrinsic evidence, the Court's legal interpretation finds support in the parties' own statements regarding their intentions.  Jack McSherry testified to his understanding that Benchmark's compensation was "tied to the end transaction" and that he was "unequivocally told that [he] always had full control of [whether there would be a transaction.]"  (J. McSherry Dep. 103:15-104:2.)  Moreover, Dean Spear explained the fee arrangement between the parties as "[t]hat [Benchmark] would be willing to do it without a fee and that we would get paid on the back end if we were able to find a buyer and get a deal that *[McSherry] wanted*."  (Spear Dep. 28:12-17 (emphasis added).)  He understood that he was "assuming a risk that [Benchmark] would get no fee whatsoever if [it] couldn't get a deal that *he wanted*"  (Id. at 28:18-22 (emphasis added).)  Spear did not interpret the Agreement to condition payment on finding a buyer that met specified terms.  Finally, Stephen Raymond acknowledged that despite producing a ready, willing, and able buyer in the Weatherly Group, Penn Tank was not excited about the deal and thus did not owe Benchmark any success fee in connection with the Weatherly negotiations because "[t]he deal did not close."[5]  (Raymond Dep. 63:14-68:17.)  In short, the parties themselves understood the

---

[5]  Via a lengthy footnote in its Opposition, Plaintiff attempts to mitigate the import of Raymond's statement on the grounds that (1) Raymond is not an officer, owner, or director of Benchmark, but rather an independent contractor; (2) the grounds and conditions under which Benchmark would be entitled to a commission are questions of law on which Raymond has no specialized background; and (3) Plaintiff has never contended that it would be entitled to a fee upon the mere production of any purchaser, only upon production of a purchaser that met the requirements initially described by Penn Tank.  (Pl.'s Opp. Mot. Summ. J. 14 n.4.)

Aside from the fact that the Court cites Raymond's testimony only to bolster an already obvious reading of the Agreement's language, Plaintiff's efforts to distance itself from Raymond are misplaced.  Raymond signed the addendum to the Agreement as Benchmark's Managing Director, thereby indicating his authority to act and speak for Benchmark.  (Def.'s Mot. Summ. J., Ex. 49.)  Further, it is irrelevant that Raymond has no specialized legal knowledge.  The Court is attempting

Agreement to mean exactly what it said – that Benchmark was not owed a fee unless a Transaction closed.[6]

Plaintiff's second – and interrelated – basis for its contrary interpretation of the Agreement is similarly unavailing.  Plaintiff contends that the contract provision at issue merely specifies the *timing* of the payment, rather than attaching a condition to it.  In support of this reading, Plaintiff cites to several cases interpreting purportedly similar provisions to reference timing as opposed to conditions precedent.  First, in Freiwald v. Fid. Interstate Cas. Co., the Pennsylvania Superior Court considered a contract provision between the plaintiff broker and defendant seller that stated, "My charges in this matter will be $1,000 for services in this matter, which is to be shared with Abner Levy *when received at the time of final and satisfactory settlement for the proposed loan*."  138 A.2d 146, 148 (Pa. 1958) (emphasis added).  The court found that this provision simply set forth the timing of the payment and did not stipulate a condition to be performed.  Id.  Similarly, in Fairbourn Commercial, Inc. v. Am. Housing Partners, Inc., a broker's listing agreement stated, "[i]f, at any

---

to discern *the parties' intent* in drafting the Agreement as they did – a matter about which Raymond is qualified to speak, as he and Dean Spear prepared the February 7, 2007 Agreement together.  (Raymond Dep. 91:13-92:16.)  Finally, although Plaintiff takes the position that it had to find a purchaser that met the requirements described by Penn Tank in order to earn its success fee, those requirements were never memorialized in any written agreement, despite the fact that Benchmark had been working on behalf of Penn Tank for over a year prior to the drafting of the Agreement at issue.

[6]  Contrary to Plaintiff's interpretation of this Court's Memorandum and Order of January 30, 2008 denying Penn Tank's Motion to Dismiss, the Court did not squarely reject Penn Tank's argument that the closing of a Transaction was a condition precedent to payment of a Success Fee.  Rather, in light of the allegations of bad faith by Benchmark, which formed part of the breach of contract count, the Court simply declined to dismiss the breach of contract claim at such an early stage of the litigation.  Benchmark Group, Inc. v. Penn Tank Lines, Inc., Civ. A. No. 07-2630, 2008 WL 282694, at *1 (E.D. Pa. Jan. 30, 2008).

Case 2:07-cv-02630-RB   Document 44   Filed 04/08/09   Page 25 of 57

time, within said period, Fairbourn Commercial Inc. procures, or presents an offer to purchase said

property from [Rochelle], at the price and upon the terms and conditions set forth herein, or at any

other price or upon any other terms or conditions acceptable to me, I agree to pay a commission

equal to $1,500.00 per lot. " 68 P.3d 1038, 1041 (Utah App. 2003), aff'd, 94 P.3d 292 (Utah 2004).

The court found that this provision unequivocally bound defendant to pay a commission upon

plaintiff's procurement of a ready, willing, and able buyer.  Id. at 1042-43.  The defendant then

attempted to argue that another provision of the contract – one stating that "[a]ll commissions shall

be due and payable at closing" – created a condition precedent to payment.  Id. at 1042.  The court

rejected this argument and found that this provision was nothing more than a timing provision that

did not create a condition precedent to otherwise unambiguous language.[7]  Id. at 1042-43

        Quite unlike these cases, however, the language in the current Agreement does not remotely

lend itself to be interpreted as merely a timing provision.  As noted above, the provision at issue

indicates that Penn Tank will pay Benchmark a success fee "upon the closing of a Transaction."

Later, in the same section of the contract, the Agreement contains a separate timing clause, wherein

it states "[t]he Success Fee is due and payable on the date of Closing."  (Pl.'s Opp. Mot. Summ. J.,

Ex. I.)  It is well-established that in construing the terms of a contract, the court must read the

contract in its entirety, giving effect to all of the contractual language if at all possible.  Whole

---

[7]  Plaintiff also cites to Finno Dev., Inc. v. Smedes Realty, Civ. A. No. 0101636875, 2001 WL
420584 (Conn. Super. Apr. 11, 2001), wherein a broker's contract provided that the "listing agent
shall be paid a 5% real estate commission by the seller directly within 72 hours from the date of
closing."  Id. at *1.  The court held that this provision "does not, by its terms, condition the payment
of the commission on the closing being concluded.  Instead, paragraph 8(c) simply establishes the
time for the commission to be paid, i.e., within 72 hours of the closing."  Id.

25

Enchilada, Inc. v. Truckers Prop. Cas. Co. of Am., 581 F. Supp. 2d 677, 690 (W.D. Pa. 2008).  "'No provision within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it.'"  AstenJohnson v. Columbia Cas. Co., 483 F. Supp. 2d 425, 463 (E.D. Pa. 2007) (quoting Sparler v. Fireman's Ins. Co. of Newark, N.J., 521 A.2d 433, 438 n.1 (Pa. Super. 1987).  Therefore, to read the first clause of the Agreement as merely a timing provision would render the second clause wholly unnecessary and entirely meaningless.  As this interpretation violates a fundamental principle of Pennsylvania contract law, the Court must instead  read the first clause as setting forth an express condition precedent and the second as a stipulation as to the timing of the payment.[8]

---

[8]  Plaintiff's Sur-reply Brief engages in a lengthy discussion of why a provision might be repeated in a contract.  It theorizes that drafters of contracts might intentionally repeat the same provision in slightly varying terms to make certain that the provision will be enforced and the parties' intentions will be effectuated.  (Pl.'s Sur-reply Br. 4.)  Additionally, it hypothesizes that provision might be repeated by "simple oversight" or "because the contract was pieced together from a series of previous forms and drafts rather than systematically composed as a whole from beginning to end."  (Id. at 5.)  Plaintiff ultimately concludes that the two provisions at issue are not wholly redundant – the first gives timing information together with proper forms of payment, while the second only deals with the timing of the payment.  Given this, Plaintiff argues that the Court should not re-write the contract simply to avoid some surplusage.

Notably, however, Plaintiff cites absolutely no case law to support this new theory of contract interpretation, which stands at odds with the general principle that "in construing a contract a court should give meaning to all its words and phrases and adopt a construction that avoids surplusage."  In re Marques, 358 B.R. 188, 198 (Bankr. E.D. Pa. 2006). Likewise, Plaintiff cites to no evidentiary support for its proposition that the parties intended such surplusage to remain in the contract, or that the surplusage was a matter of mere error.  Indeed, it is Plaintiff, not Defendant, who now asks this Court to disregard the Pennsylvania rules of contract interpretation and modify the plain meaning of the contract under the guise of interpretation.  See Wineburg v. Wineburg, 816 A.2d 1105, 1108 (Pa. Super. 2002) ("[A] basic tenet of contract law is that when the language of a contract is clear and unambiguous its meaning must be determined by an examination of the content of the contract itself. Therefore, it is axiomatic that this Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.").  The Court finds no ambiguity in the Agreement at issue.

In short, the Agreement at issue is unambiguous on its face and must be interpreted according to the natural meaning of its terms.  Guided by the rules of contract interpretation set forth under Pennsylvania law, the Court finds that the parties intended to condition Benchmark's entitlement to a success fee on the closing of a transaction.  Such a reading is supported not only by the plain language of the provision at issue, together with the surrounding language, but also by the parties' own statements regarding their intent.  Accordingly, the Court rejects Plaintiff's claim that it was entitled to payment upon production of a ready, willing, and able buyer.[9]

**2.      Whether Defendant is Estopped from Relying on the Failure of the Condition Because Defendant is the One Who Prevented It from Occurring**

Plaintiff's second argument in support of its claim to a success fee contends that even if the Agreement in this case had conditioned Benchmark's right to a commission on the closing of a sale, it was Penn Tank's arbitrary refusal to consummate the transaction that caused the condition to fail. Plaintiff goes on to reason that, under the applicable law, a party's unilateral prevention of the performance of a condition in a contract estops that party from benefitting from that failure. Because Benchmark secured a proposal from Crystal Ridge that purportedly satisfied all of Penn Tank's terms, Benchmark claims that Penn Tank cannot now avoid liability by arbitrarily walking away from the transaction.

---

[9]  In light of this finding, the Court declines to address the parties' dispute as to whether Benchmark had, in fact, produced such a buyer via the Crystal Ridge letter of intent.  The Court, however, notes Benchmark's concession at oral argument that the Crystal Ridge deal was subject to due diligence and many other contingencies, which might not have occurred even if Penn Tank had committed to the deal.

"As a general rule, when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure." Apalucci v. Agora Syndicate, Inc., 145 F.3d 630, 634 (3d Cir. 1998) (citing Pennsylvania law). "In other words, where a party to the contract prevents the other party from performing its part, the contract is breached." ATF Trucking, L.L.C. v. Quick Freight, Inc., Civ. A. No. 06-4627, 2008 WL 2940795, at *3 (E.D. Pa. Jul. 29, 2008).

In order for a party to enforce an agreement, however, it must prove that it has performed all of its obligations under the contract. Id. Where, however, the contract does not define the parameters in which a party must allow the performance of the condition, that party has not acted in breach by preventing the condition from occurring. This principle was fleshed out in two factually-similar cases hailing from this Court. In Miller v. Corson, 321 F. Supp. 861 (E.D. Pa. 1971), the defendant obtained plaintiff's services in securing financing for his business. Id. at 862. Defendant told plaintiff that he needed approximately $250,000 to $300,000 in financing and indicated that he desired to keep the interest rate "as low as possible." Id. No agreement was reached as to the specifics of a loan that would be acceptable to the defendant, either as to the amount, rate, terms of repayment, or security for the loan. Id. Further, there were no precise arrangements for payment of a commission, although the defendant agreed that a commission would be proper if an acceptable loan could be negotiated. Id. Thereafter, plaintiff arranged meetings with a lending institution who set forth various terms for a net loan of $225,000. Id. at 863. After several meetings, defendant

advised that the proposal was unacceptable, but plaintiff still sought a commission for his services in effecting the commitment for the loan.  Id.

The court noted that "[n]o objective guidelines were established to define exactly what terms would be acceptable to [the defendant]," and "an open-ended agreement whereby [plaintiff] would earn a commission by producing a commitment letter for a loan regardless of the terms of the proposed loan [was] highly unlikely."  Id. at 864.  It recognized the general rule that "where a broker finds a customer ready, willing, and able to enter into a transaction on the terms proposed by the principal, he cannot be deprived of his right to a commission by reason of the transaction failing because of some fault of the principal."  Id.  Nonetheless, it deemed this principal inapposite since, in the cases applying it, "there was a prior agreement between the borrower and the broker which set certain standards for the terms of the loan sought."  Id. at 864-65.  In the present case, there were no "previously agreed upon guidelines relating to what terms would fall within the realm of acceptability."  Id. at 865.  Accordingly, the court held that "[t]he defendants had the option to reject any proposed loan arrangement so long as their rejection was in good faith and not capricious."  Id.

Similarly, in Feinberg v. Auto. Banking Corp., 353 F. Supp. 508 (E.D. Pa. 1973), the defendant was a consumer finance business that contacted plaintiff, a broker, to assist it in finding financing with a suitable lender.  Id. at 509-10.  Plaintiff found a lender who was willing to loan $300,000 at a six percent interest, and told defendant that it would add a finder's fee of two percent over the life of the loan.  Id. at 510.  When defendant indicated that this finder's fee was not acceptable, the deal was renegotiated so that the loan amount would be $350,000 at 6% interest, and

29

the finder's fee would be $50,000.  Id.  Plaintiff, defendant, and the lender agreed to this

arrangement.  Id.  After several weeks of efforts by defendant and the lender to arrive at a formal

note purchase agreement, they were unable to agree to the terms and the loan transaction was

abandoned.  Id. at 510-11.  Nonetheless, plaintiff sought payment of his finder's fee on the grounds

that he found a lender "ready, willing and able" to lend.  Id.

    The court held that "absent a showing of an agreement to the contrary or a showing of bad

faith on the part of the [defendant], the [defendant's] promise to pay [plaintiff] was conditional upon

[the defendant's] satisfaction with the terms of the note purchase agreement."  Id. at 513.  Citing to

Miller, it remarked that "the test is not whether the person ought to be satisfied but whether he is

satisfied, there being, however, this limitation that any dissatisfaction must be genuine and not

prompted by caprice or bad faith."  Id.  It went on to reason that "[n]ot only is there a lack of

evidence of an agreement to the contrary, but there are indications that [plaintiff] understood that the

obligation would and could not come about until after the loan had been actually consummated."  Id.

As the court deemed the defendant's refusal to go through with the loan transaction justified and in

good faith, it declined to hold that plaintiff was entitled to a finder's fee.  Id.

    The case at bar is closely akin to these two referenced cases.  Benchmark had been actively

working with and seeking out a buyer for Penn Tank since January 2006.  Although there had been

verbal discussions about what Penn Tank was generally looking for in a buyer, no clearly defined

terms as to what constituted an acceptable buyer had been agreed upon or specified.[10]  When the

_____

[10]  The exhibits in this case establish that even the parties could not verbally agree on what terms, if
any, were required for Penn Tank to go forward with a transaction.  Raymond recalled McSherry

parties ultimately signed the written Agreement in February 2007, they again neither specified any

requirements for what would suffice as an acceptable buyer nor identified any defined parameters

---

mentioning, in January 2006, that he wanted a minimum of five times EBITDA, "good chemistry with the investor," "continuity for the business," and to make sure that his son Steven had an equity stake going forward. (Raymond Dep. 46:19-47:2.) That's all he could recall. (Id. at 47:3.) Later, in his deposition, Raymond added to these parameters and indicated that he told Crystal Ridge that McSherry also wanted a deal that would allow him to participate in the company as both equity holder and operating partner and that would allow him to take some liquidity now and participate in the up side as the company was sold in the future. (Id. at 87:11-17.)

Spear indicated that he knew Benchmark would only get a fee if it found a buyer and got a deal that McSherry wanted. (Spear Dep. 28:1417.) Without any specifics, Dean explained that Penn Tank and Benchmark "had an understanding that if we found a buyer that was going to be on terms that were acceptable to the client, that we were going to get paid under the formula of our success fee in our prior agreement." (Id. at 29:15-21.) Later, he noted that McSherry had "made it clear that he was not willing to do anything under five times EBITDA, so they had to at least be able to be at a, you know, 31 plus million-dollar valuation." (Id. at 72:15-19.) Finally, Spear indicated his understanding that "if [McSherry] was going to give up control of his business, it had to be with a group that he had confidence and faith in, that was going to help him go forward, and be comfortable that the minority position the family held was going to be reasonably protected, and that the new – the new organization and the new group that owned the majority was going to have similar shared values as he had." (Id. at 79:18-80:3.)

Jack McSherry stated that although he was effectively looking for a "wow factor" or an offer he could not refuse, he never translated what that meant in terms of a multiple of EBITDA to either Spear or Raymond. (J. McSherry Dep. 73:18-75:13.) He indicated that he had never specifically identified his number as five times EBITDA, and never had any specific number in mind. (Id. at 79:11-80:25, 89:2-90:25.)

Finally, Stephen McSherry could not recall any discussions prior to August of 2006 wherein his father indicated that five times EBITDA would be a number that he would be willing to consider. (S. McSherry Dep. 37:19-38:22.) He reiterated that his father stated that any proposal had a wow factor to it for him to walk away from the company. (Id. at 101:3-19.)

Even reading all of this evidence in the light most favorable to Plaintiff, the Court must conclude that the parties had no meeting of the minds in their oral agreement as to the precise requirements for an acceptable buyer – meaning no contract on that issue was formed. See Brisbin v. Superior Valve Co., 398 F.3d 279, 293 (3d Cir. 2005) (a legally binding contract requires a meeting of the minds). The repeated references to five times EBITDA only suggested that McSherry would not do business with any lower number, not that he would definitively do business when that number was reached.

under which Benchmark would operate.[11]  Once the written Agreement was signed it became the

"entire agreement of the parties with respect to the subject matter," which "supersede[d] all previous

agreements."  (Pl.'s Opp. Mot. Summ. J., Ex. I.)  As such, any purported prior, verbal understanding

as to what constituted an acceptable proposal was rendered a nullity by the absence of such terms in

the written instrument.

The glaring omission of such terms from the Agreement meant that the test for satisfaction of

the condition was not whether Penn Tank should have been satisfied, but rather whether it was

satisfied.  Surely, Penn Tank did not enter into "an open-ended agreement whereby [Benchmark]

would earn a commission by producing a commitment letter for a[n] [investor] . . . regardless of the

terms."  Miller, 321 F. Supp. at 864.  Thus, [t]he defendants had the option to reject any proposed

loan arrangement so long as their rejection was in good faith and not capricious."[12]  Id. at 865.

Ultimately, Defendant did not prevent Plaintiff from performing the contract; rather Plaintiff failed

to satisfactorily perform by producing a buyer that was satisfactory to Defendant.  Contrary to

Plaintiff's argument, Defendant's failure to allow occurrence of a condition required for payment of

the success fee was not a breach of contract.

### 3.     Conclusion as to Benchmark's Contractual Entitlement to a Success Fee

---

[11]  This omission is particularly telling since the parties had already been working together under a
verbal agreement for fourteen months.  Had there been previously agreed upon verbal terms of
acceptability for a proposed buyer which were crucial to determining when Benchmark would earn
its Success Fee, the Agreement would have, under the most basic theories of contractual drafting,
included them.

[12]  Plaintiff argues that Defendant did indeed act in bad faith.  The Court addresses that claim in the
next section of this Opinion.

The plain contractual language, bolstered by extrinsic evidence, clearly conditioned Plaintiff's entitlement to a success fee upon the closing of a Transaction – an event which did not occur.  The mere fact that Defendant was unilaterally responsible for the failure of the closing does not constitute a breach of contract since the Agreement set forth no requirements under which Defendant was required to act.  Accordingly, the Court grants summary judgment in favor of Defendant on this portion of the Complaint.

### B.      Whether Penn Tank Breached the Implied Duty of Good Faith and Fair Dealing

Defendant next moves to dismiss Plaintiff's claim for breach of the covenant of good faith and fair dealing.  "In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract."  Temple Univ. Hosp., Inc. v. Group Health, Inc., Civ. A. No. 05-102, 2006 WL 146426, at *6 (E.D. Pa. Jan. 12, 2006) (quoting Lyon Fin. Servs. v. Woodlake Imaging, LLC, Civ. A. No. 04-3334, 2005 WL 331695, at *8 (E.D. Pa. Feb. 9, 2005)).  The duty of good faith has been defined as "honesty in fact in the conduct or transaction concerned."  RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981).  Examples of bad faith can include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d).  Courts use this good faith duty as "an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action."  Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 ((3d Cir. 2000).  Although the precise contours of a party's duty under the covenant vary with the context, good faith generally entails "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"

33

Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 617 (E.D. Pa. 2003) (quoting RESTATEMENT (SECOND) § 205 cmt. a).

Notably, "Pennsylvania law does not . . . recognize an independent claim for breach of the implied covenant of good faith and fair dealing." Lyon, 2005 WL 331695, at *8. "The duty of good faith is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." Northview Motors, 227 F.3d at 91; see also Seal v. Riverside Fed. Sav. Bank, 825 F. Supp. 686, 699 (E.D. Pa. 1993) ("[T]he implied duty of good faith cannot defeat a party's express contractual rights by imposing upon that party specific obligations that it is entitled, by express contract, to resist."). Therefore, a party is generally precluded from maintaining separate claims for breach of contract and breach of the covenant of good faith and fair dealing where both causes of action arise out of the same conduct by the defendant. Northview Motors, 227 F.3d at 91-92; Morgan Truck Body, LLC v. Integrated Logistics Solutions, LLC, Civ. A. No. 07-1225, 2008 WL 746827, at *5 (E.D. Pa. Mar. 20, 2008). As the Third Circuit has explained, "[t]he covenant of good faith and fair dealing involve[s] an *implied* duty to bring about a condition or to exercise discretion in a reasonable way'" so that "implied covenants and any express terms of a contract are necessarily mutually exclusive – one can invoke implied terms only when there are no express terms in the contract relating to the particular issue." USX Corp. v. Prime Leasing Inc., 988 F.2d 433, 438 (3d Cir. 1993) (internal quotations omitted) (emphasis in original). "The law will not imply a different contract than that which the parties have expressly adopted." Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 388 (Pa. 1986). Thus, in order to plead a cause of action for breach of the covenant of good faith, whether it is an express or implied covenant, a plaintiff must allege facts to

establish that a contract exists or existed, including its essential terms, that defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract *other than the covenant of good faith and fair dealing,* and that resultant damages were incurred by plaintiff.   Sheiman Provisions, Inc. v. Nat'l Deli, LLC, Civ. A. No. 08-453, 2008 WL 2758029, at *3 (E.D. Pa. Jul. 15, 2008) (emphasis in original).

In its Opposition to the Motion for Summary Judgment, Benchmark argues that Penn Tank violated the duty of good faith and fair dealing by:  (1) concealing its true agenda from Benchmark; (2) stringing Benchmark along for fourteen months when Penn Tank had no intention of consummating a sales transaction; (3) failing to notify Benchmark that Penn Tank was applying for bank loans as an alternative to the sales transaction for which Penn Tank had retained Benchmark; (4) surreptitiously using the Confidential Offering Memorandum in pursuit of the loans that Penn Tank was seeking in order to avoid its obligation to Benchmark; and (5) refusing to consummate a transaction that satisfied all of its terms, while contending that consummation of the transaction was a condition precedent to Benchmark's entitlement to a success fee.  (Pl.'s Opp. Mot. Summ. J. 23.) The Court addresses each of these claims.

> **1.**    **Penn Tank's Concealment of Its True Agenda from Benchmark, Stringing Benchmark Along Without Intention to Consummate a Sales Transaction, and Refusal to Consummate a Transaction that Satisfied All of Its Terms while Refusing to Pay Benchmark a Success Fee**

Plaintiff first contends that the McSherrys were never serious about selling Penn Tank and were instead just using Benchmark to see if they could obtain a high valuation for their company without payment for Benchmark's services.  (Id. at 20.)  Once Penn Tank had the fruits of fourteen

months of Benchmark's services, including both the Crystal Ridge letter of intent and the Offering

Memorandum, Penn Tank was able to use them to obtain credit approval from National Penn Bank.

(Id. at 21.)  Such actions, it claims, constitute bad faith dealing.

Penn Tank's argument is misplaced on several grounds.  First and foremost, Plaintiff's

allegations attempt to alter the unequivocal terms of the contract between the parties.  As repeatedly

described above, the Agreement between the parties expressly conditioned the Success Fee on the

closing of a transaction, without setting forth any alternate formula for payment of a fee in the event

a transaction did not occur.  Were the Court to now find that Penn Tank acted in bad faith either by

not proceeding with the letter of intent from Crystal Ridge or by not paying Benchmark upon the

production of that letter of intent, the Court would effectively be reading into the Agreement a

provision that a success fee was owed upon the production of a ready, willing, and able buyer.  Such

a reading is particularly inaccurate in light of the absence of any previously agreed upon guidelines

relating to acceptability and or any contractual obligation on Defendant to close a deal.  Had the

parties intended such a result, it would, or should have been explicitly stated in the contract.  As

noted above, "[t]he law will not imply a different contract than that which the parties have expressly

adopted."  Hutchison, 519 A.2d at 388.

Even were the Court to find – purely for argument's sake – that Defendant had some

additional obligation imposed by the implied covenant, Plaintiff fails to produce any substantive

evidence that:  (1) Penn Tank's refusal to consummate the transaction with Crystal Ridge was in bad

faith or motivated by ill-intent; (2) Penn Tank concealed its true agenda from Benchmark; or (3)

36

Penn Tank interfered with Benchmark's expectation or purpose of the contract.  Indeed,

Benchmark's sole – and somewhat attenuated – effort to establish that Penn Tank unfairly used

Benchmark without any intention of consummating a deal consists of citation to snippets of Jack

McSherry's statements and testimony as follows:

- In an e-mail from McSherry to Jack Williams, another Penn Tank shareholder, McSherry stated that in his upcoming meeting with Benchmark in January of 2006, he wanted to put together some financial statements to "water [Benchmark's] tongues."  (Pl.'s Opp. Mot. Summ. J., Ex. T.)

- "I was always reticent in giving up a majority equity position in the company.  Was I interested in seeing what it was worth?  Yes."  (J. McSherry Dep. 21:6-9.)

- McSherry wanted to "test the waters" to see how much the company was worth.  (Id. at 21:23-22:19.)

- "I agreed to let [Benchmark] explore," but "[t]o my knowledge, I never engaged them."  (Id. at 39:25-40:11.)

- "[T]he purpose for the work that Benchmark was doing was to find out what the [company] was worth . . . in the event of a buyout . . . [a]s opposed to actually accomplishing the taking in of an equity partner."  (Id. at 53:21-54:3.)[13]

- "I think the whole reason that we're sitting here is because I never knew what I really wanted to accomplish."  (Id. at 60:7-9.)

- "I had been dealing with National Penn Bank personally since 1995.  I didn't think I had to have a conversation with [Benchmark] about what I was talking to the banking about our company, no."  (Id. at 65:22-66:2.)

---

[13]  This statement was actually made by counsel during the deposition, but was fully adopted by McSherry.

- By the end of February, McSherry was not interested in selling the company in the absence of a wow number, which was in excess of six times EBITDA.  (Id. at 91:3-92:5.)

At first blush, and taken in isolation, this evidence implies some potential bad faith dealing on the part of Penn Tank.  Closer scrutiny, however, reveals that the majority of these statements were taken out of a context that actually tells quite a different story.  First, Jack McSherry's testimony indicates that Penn Tank did not seek out Benchmark's services; rather it was Benchmark that solicited Penn Tank's business and encouraged it to start looking at potential investors.  In a January 24, 2006 e-mail to Steve McSherry and Jack Williams, Jack McSherry stated:

> I've got a meeting with Benchmark here on January 25th. . . . I've stayed in touch with the one fellow Steve Raymond and he's the one that called me about Keenan.  Anyway there [sic] courting us now since they know we are doing much better.  I'm just going to listen, not engage them.

(Pl.'s Opp. Mot. Summ. J., Ex. T.)  He further testified, at his deposition, as follows:

> Q.   Did there come a time when you had an interest in selling a portion of the company, majority – I'm not confining myself to your giving up a majority interest in the company.
>
> A.   I believe that I was convinced by Benchmark that our performance was good enough that we should test the waters and see what the company could bring, whether it was a majority interest, a minority interest, or whatever.

(J. McSherry Dep. 21:24-22:9.)

Moreover, on repeated occasions, McSherry explained that he told Benchmark, from the outset, of his hesitance in selling the company.  Nonetheless, Benchmark was willing to forego its

retainer fee in order to encourage McSherry to look into finding out the worth of his company and

potentially sell it.

> Q.    Okay.  And your view was to let Benchmark do this because you had an idea that the company was worth more than that SES evaluation and you wanted to see exactly how much that was.  Is that a fair statement?

> A.    Yes.

> Q.    And in your mind, was that the only purpose for which you allowed Benchmark to go forward and do its work?

> A.    To test the waters, yes.

> Q.    And that didn't change between January of '06 until, let's say, the end of February? That was always your purpose, is that correct, this testing the waters, as you call it?

> A.    *It was more like I was – it was more like I was egged on to find this out.  It was not that I was soliciting somebody out there to buy the company.  It was more like, we think you're doing well, you ought to take a look at what your company is worth, let us market it to you, it's not going to cost you anything.*

> Q.    And who said that to you, let us market it to you, it's not going to cost you anything?

> A.    I can't recall if it was – it was Dean Spear or Steve Raymond, which are the only two I talked to at Benchmark.

(Id. at 22:10-23:14 (emphasis added).)

> Q.    In your view, from conversations which you had with the people at Benchmark, did you believe they understood, as of December 31st, 2006, that you were not interested in selling a majority position in the company?

A.     I had always expressed that interest to them.

(Id. at 54:21-55:4.)

Q.     Was there a minimum number that you had set in your mind that would be a satisfactory number for you to do any kind of deal, as far as enterprise value is concerned.

A.     I don't think I had any one set number in mind.  If a large multiple came in, as some trucking companies are traded, seven, eight, nine, as I said earlier to you, everybody has a price.

Q.     Sort of an offer you can't refuse?

A.     A wow factor, a shut-up number.

(Id. at 58:14-24.)

A.     I think the whole reason that we're sitting here is because I never knew what I really wanted to accomplish.

Q.     Okay.  Did [Benchmark] have any instructions from you as to what they should try to accomplish?

A.     I don't believe so.

(Id. at 60:7-13.)

Q.     Did you believe at that point that [Benchmark was] entitled to compensation of any kind for the work they had done up through November of 2006?

A.      As I said earlier, I was surprised that they hadn't come to me and asked me for a monthly fee on an ongoing basis.

Q.      And why were you surprised?

A.      When a company spends time and they're not sure they're going to get a transaction fee, I would have thought they would have pushed for a monthly fee, because I was somewhat, as I told you, reticent about where I really wanted to go.

Q.      Did you consider – so I guess one of the reasons you were surprised is because you felt they were somewhat exposed in having done all this work and possibly never having – never getting paid for the work.  Is that one of the reasons you were surprised?

A.      I think your characterization of a lot of work is incorrect.

Q.      All right.  Don't say a lot of work, let's just say work.

A.      Work.

Q.      Is that a fair statement?

A.      Companies don't do things for nothing.

Q.      And you were surprised because they had done work up to that point without having any understanding of how they were going to get paid; is that what you're saying.

A.      I was surprised, but I understood why they didn't ask.

Q.      Okay.  And from your experience, what was your understanding as to why they didn't ask.

A.      If they had asked for a fee, I would have shut the whole thing down.

(Id. at 68:12-70:7.)

Q.      And is it your testimony that the reason you're going forward and having a third group become involved is because Benchmark is asking you to do this?

A.      Yes.

Q.      So you really don't have any interest in finding out what a third group thinks?

A.      You're relating this to early December of '06?

Q.      Uh-huh.  Yes.

A.      I was becoming more reticent, even more so in early December, about a majority equity position in the company, because my second son was coming into the business in January, but if there was a wow factor out there, I was willing to take another look at it.

* * *

Q.      And I don't mean you used the word wow.  I mean, you know, you could use the Godfather's expression of an offer you couldn't refuse.  Did you tell them that that's what you were . . . looking for?

A.      In fact, I used that exact term.  If there's an offer out there I can't refuse, I'll take a look at it.

Q.      And Dean Spear and Steve Raymond, throughout 2006, said that they were willing to work on that basis without – without compensation, understanding that they were going to have to find an offer that you couldn't refuse?

A.      Fees were not discussed through 2006, that I can recall.

Q.      So you told them either exactly or words to the effect that if you find me an offer I
        can't refuse, that's when I would do a deal, but in the context of such a conversation,
        no fees were discussed; correct?

A.      I believe that to be correct.

(Id. at 72:24-74:21.)

        Finally, McSherry testified that he always believed that whether or not to close on a

Transaction was entirely in his discretion and, if he opted not to do so, he was not accountable for

any fees to Benchmark:

Q.      And did you at that time anticipate that if you had gone with your recap of the
        companies' equipment, plural, companies' equipment, to secure liquidity, that they
        would be entitled to any compensation for the work they had done and for the work
        that they were going to do to get you to a point where you'd see a Crystal Ridge
        offer?

A.      I always felt that their compensation was tied to the end transaction.

Q.      And you controlled – at this time, you controlled whether there would be a
        transaction; correct?

A.      I was unequivocally told that I always had full control of that.

Q.      Of whether there would be a transaction?

A.      Yes.

Q.      Who told you that?

43

A.      Benchmark, both parties.

(Id. at 103:7-104:2.)

Q.      Okay?  You weren't interested in selling the business as of the end of February, 2007.
        Is that a fair statement?

A.      February? Yes.

Q.      End of February.  Is that a fair statement?

A.      I think that's a fair statement.

Q.      Did you tell anyone from Benchmark that that was your position in or around January
        or February 207, that that was your position?

A.      No.  I was – my interest was still piqued.

Q.      You wanted to see what the offer would be?

A.      Correct.

Q.      And that was for purposes of understanding what your company was worth, as
        opposed to because you were dying to sell it.  Is that a fair characterization?  Or sell a
        portion of it.

A.      I was not dying to sell it, but when you start putting seven zeros on the back of things,
        you stop and think about what you really want.

(Id. at 91:23-92:23.)

44

Even more telling for summary judgment purposes than McSherry's own testimony, however, is that of Benchmark employees Raymond and Spear.  Each testified that McSherry was hesitant to sell the company; that they solicited Penn Tank's business, not the other way around; and that they were willing to go forward with only the potential of a large payout.  Raymond indicated as follows:

> Q.    Am I correct that Benchmark then contacted Penn Tank Lines again in January of 2006?
>
> A.    Yes.
>
> Q.    And who on behalf of Benchmark made that contact?
>
> A.    I did.
>
> * * *
>
> Q.    And what led you to contact Penn Tank Lines at that time?
>
> A.    It was a major competitor by the name of Keenan Advantage, told from one private equity group to another.

(Raymond Dep. 32:21-33:11.)

> Q.    Do you remember what Jack told you he wanted to do with the business?
>
> A.    I can't quote Jack verbatim, *but I recall that he said he was in no hurry to do a deal* but still interested in doing a recapitalization deal.  He was looking for liquidity for his personal purposes and also to continue to grow the company.

(Id. at 37:17-23 (emphasis added).)

     Q.     Was it your belief that there was an understanding between Benchmark and Penn Tank Lines about how Benchmark would be compensated for any advice or services that it provided to Penn Tank Lines at that time?  And we're talking about the first half of 2006?

     A.     Jack made it clear in our discussions that he was not interested in renewing the retainer as part of compensation?

* * *

     Q.     During the same time period, that January through June 2006, first half of 2006, was there any discussion about payment of a commission or a success fee to Benchmark for any services that would be performed for Penn Tank Lines?

     A.     Yes, in the context of the same discussions.

     Q.     And what was discussed?

     A.     Jack agreed to pay us as was outlined in the prior engagement.

(Id. at 38:17-40:6.)

Likewise, Spear testified, as follows:

     A.     I recall that we [McSherry and Spear] discussed [at the January 2006 meeting], you know the marketplace and their [Penn Tank's] recent performance if they wanted us to go forward and put our toe in the water, we would be happy to do that.  Jack was – made it clear he really wasn't wanting to get into another retainer situation, but since we felt reasonably comfortable that the marketplace was better and his performance was better, we agreed we already had an agreement and an understanding in place that would compensate us for our work and it was clear.

     Q.     What was said by you, if anything, about the fee arrangement to Mr. McSherry?

A.   *That we would be willing to do it without a fee and that we would get paid on the back end if we were able to find a buyer and get a deal that he wanted.*

Q.   *You knew that you were assuming a risk that you would get no fee whatsoever if you couldn't get a deal that he wanted; is that correct?*

A.   *That's correct.*

\* \* \*

Q.   You understood – it was your belief that in January of '06, before you met again with Penn Tank Lines, that Penn Tank Lines had an exclusive arrangement with your company?

A.   *It was my understanding, without, again, reviewing the agreement, that we had an understanding that if we found a buyer that was going to be on terms that were acceptable to the client, that we were going to get paid under the formula of our success fee in our prior agreement.*

(Spear Dep. 27:23-29:21 (emphasis added).)

A.   *[I]f [McSherry] was going to give up control of his business, it had to be with a group that he had confidence and faith in,* that was going to help him go forward, and be comfortable that the minority position the family held was going to be reasonably protected, and that the new – the new organization and the new group that owned the majority was going to have similar shared values as he had."

(Id. at 79:18-80:3 (emphasis added).)[14]

---

[14]   Plaintiff also cites to the following testimony by Spear:

Q.   You knew in January that – you had gotten an E-mail from Jack McSherry in which he said we're leaning towards doing equipment refinancing.  How did you understand that?

A.   We went over that this morning.  I basically explained to him when I called

Taken cumulatively, the plain import of this testimony reveals that Benchmark, recognizing the relatively high worth of Penn Tank, repeatedly courted its business in order to obtain a potentially high success fee in connection with a negotiated transaction.  Benchmark understood that McSherry was hesitant and not fully committed to selling his company.  Thus, in order to encourage a reticent McSherry to at least entertain offers, Benchmark posited an enticing proposal – it would do the leg work without a retainer fee so long as it would profit from any successful sale.  By doing so, its principals knowingly took a risk that its failure to consummate that transaction would vitiate its entitlement to compensation.  Although Benchmark operated under some broadly defined parameters in its search for a buyer, it never made any attempt, despite knowing of McSherry's uncertainty, to detail in writing the precise qualifications of an acceptable buyer, or to enumerate an alternative formula for payment if the transaction did not close.  Instead, cognizant that McSherry was hesitant and would not work with Benchmark if he believed himself obligated in any fashion, Benchmark repeatedly led him to understand that it was not seeking any compensation unless he closed on a deal that it negotiated, and that the closure on a deal was entirely up to him.

---

> him, I said, what's up, what's this all about, okay, we have a – I believe we're going to have a very favorable offer to meet your terms and parameters, and if you want me to stop in the direction I'm going because you now want to go in another direction, let me know so I don't waste my time.
>
> And he said, no, I just had, you know, some issues of, you know,  I'm having some thoughts, and I want you – I'm not going to do that.  If you're going to get me the deal I want, I'm going to go forward with that deal.  Please don't stop, go forward.  That's not going to be an issue.

(Spear Dep. 119:23-120:18.)  Nothing in this testimony is inconsistent with McSherry's repeated position that, although he was "not dying to sell" the company, he would have considered doing so with the right offer.  As of January 2007, he simply had not yet made that decision.  (J. McSherry Dep. 92:20-23.)

Benchmark now asks the Court to imply into the contract a provision it could not have included itself without risking the loss of Penn Tank's business.  This we decline to do.  Nothing in the deposition testimony and exhibits presented by Plaintiff remotely suggests that McSherry acted in bad faith or enticed Benchmark into gratuitously performing services on which he had no intention of acting.  Given this stark absence of a genuine issue of material fact, the Court rejects this portion of Plaintiff's bad faith claim.

**2.**     **Penn Tank's Failure to Notify Benchmark that It Was Applying for Bank Loans as an Alternative to a Sales Transaction**

Additionally, Benchmark alleges that Penn Tank applied for bank loans as an alternative to the sales transaction, yet never disclosed this information to Benchmark.  These actions, according to Plaintiff, were in direct violation of numerous provisions of the contract, which, *inter alia*, required Penn Tank "to provide Benchmark with all relevant information," "to advise Benchmark promptly of all contacts and proposals from prospective purchasers," and "to use commercially reasonable efforts to cooperate with Benchmark."  (Pl.'s Opp. Mot. Summ. J. 22.)

Again the Court finds no evidence of bad faith.  As a primary matter, none of the above cited provisions addresses the situation at hand.  The requirement that Penn Tank provide Benchmark with "all relevant information" and use "commercially reasonable efforts to cooperate with Benchmark" are too vague and amorphous to be enforced by this Court.  Gen. Elec. Co. v. N.K. Ovalle, 6 A.2d 835 (Pa. 1935) ("[a] contractual promise cannot be judicially enforced unless it is sufficiently definite to enable the court to ascertain the intention of the parties to a reasonable degree of certainty.").  Even were the Court to read them broadly, the terms "relevant information" and "cooperate with Benchmark," in context, appear to apply to information about Penn Tank, which would help Benchmark market the company, not information about Penn Tank's negotiations regarding its banking lines.  Finally, although Penn Tank was required to advise Benchmark of all contacts and proposals from prospective purchasers, National Penn Bank was not a purchaser and, thus, would not fall within the realm of this provision.

50

Moreover, the evidence supplied by the parties does not show any bad faith on the part of Penn Tank.  Although Penn Tank was talking with National Penn Bank as early as June of 2006, the discussions concerned only the Bank's taking over of Penn Tank's banking lines from Bank of America.  In the last few months of 2006, Penn Tank was speaking with National Penn Bank only about the possibility of the Bank taking over Penn Tank's banking lines and providing a new credit line when its current structure with Bank of America was finished.  (S. McSherry Dep. 66:3-67:7.)  The discussions with National Penn Bank in connection with refinancing some of Penn Tank's debt and providing some liquidity did not earnestly begin until early March of 2007.  (Id. at 13:5-23.)  As Stephen McSherry explained, Penn Tank simply saw the bank option as an alternative path to obtaining what it did not feel it could achieve from the Crystal Ridge deal.  (Id. at 33:11-24.)  Nothing in the evidence supports Plaintiff's theory that Penn Tank was simply stringing Benchmark along for fourteen months with the intention of using Benchmark's efforts to obtain alternate financing.

### 3.      Penn Tank's Use of the Offering Memorandum

Finally, Plaintiff argues that Defendant's "surreptitious" use of the Offering Memorandum prepared by Benchmark in order to purse loans from National Penn Bank constituted bad faith dealing.  Specifically, Plaintiff notes that the Agreement between the parties stated that, "[a]ny financial advice or opinions rendered by Benchmark in connection with this Agreement or a Business Combination may not be disclosed publicly in any manner without Benchmark's prior written approval."  (Def.'s Mot. Summ. J., Ex. I.)  Yet, on April 9, 2007, Steve McSherry, without

51

consulting Benchmark, gave a copy of the Offering Memorandum to National Penn Bank, portions of which were later incorporated into the loan approval application to the Bank.  As the Offering Memorandum was clearly labeled "confidential," Plaintiff contends that Penn Tank's provision of that Offering Memorandum to the bank, in order to secure loans in alternative to a Benchmark-brokered sales transaction, violated the implied covenant of good faith.

The Court, however, again finds no breach of contract or bad faith dealing in Penn Tank's actions on two grounds.  First, as noted above, the Agreement prohibited only disclosure of "[a]ny financial advice or opinions rendered by Benchmark in connection with this Agreement or a Business Combination."  (Pl.'s Opp. Mot. Summ. J., Ex. I.)  Steve Raymond unequivocally testified that the Offering Memorandum did not contain any financial advice or opinions rendered by Benchmark:

> Q.    Well, let me ask you to look through the offering memorandum and identify for me any financial advice that is contained in the offering memorandum that was rendered by Benchmark.
>
> A.    This is no financial advice contained in this.  I don't have to look at that to tell you that.
>
> Q.    Could you look in the offering memorandum and tell me if there are any opinions rendered by Benchmark?
>
> A.    The question was: Were there any opinions in this document by Benchmark? There were no opinions of Benchmark in that document.

(Raymond Dep. 144:14-145:2.)  This testimony is confirmed by the Offering Memorandum itself, which plainly stated that it was prepared by Benchmark solely from materials and information supplied to Benchmark by Penn Tank, and included statements, estimates, and projections provided by Penn Tank and not verified by Benchmark.  (Def.'s Mot. Summ. J., Ex. 28.)[15]

Moreover, the evidence reveals that although the loan approval request incorporated some of the information and verbatim statements from the Offering Memorandum, the Bank already had multiple sources of information about Penn Tank prior to receipt of the Memorandum and used it primarily for verification.  (Soxman Dep. 75:11-78:13.)  As Defendant aptly notes, "[i]nformation about Penn Tank Lines provided by Penn Tank Lines to Benchmark did not become the property of Benchmark merely by being included in the Offering Memorandum."  (Def.'s Mot. Summ. J. 32 n.15.)  Ultimately, the loan was approved based on the Bank's own independent analysis.  (Id. at 73:6-74:25.)  Accordingly, Plaintiff fails to establish that the Bank loan was obtained through Benchmark's work product.

### 4.     Conclusion as to Bad Faith

As noted above, on summary judgment, the moving party may meet its burden by showing an absence of evidence to support the nonmoving party's claim.  Celotex v. Catrett, 477 U.S. 317, 323

---

[15]  Dean Spear testified that the Offering Memorandum was created by taking the extensive information provided by Penn Tank and molding it into a shortened book of information "aimed at trying to present Penn Tank Lines in the most favorable setting to a potential buyer."  (Spear Dep. 169:3-170:17.)  In his view, the Offering Memorandum constituted Benchmark's professional opinion based on its expertise in the business of marketing companies.  (Id.)  Notably, however, when pressed, Spear could not identify any specific financial advice or opinions rendered by Benchmark that were contained within the Memorandum.  (Id. at 171:11-175:7.)

(1986).  Defendant has both pointed to an absence of evidence to support Plaintiff's claim and

produced its own evidence substantiating its theory of the case.  Plaintiff has not carried its contrary

burden of creating a genuine issue of material fact as to bad faith; there is no conflict or dispute in

the evidence.  As Plaintiff has failed to provide this Court with any basis on which to let this issue

go to a jury, the Court must grant summary judgment in Penn Tank's favor.

     **C.**     **Whether Benchmark Can Recover "Costs of Collection" Including Attorneys' Fees**

In the final portion of its Motion for Summary Judgment, Penn Tank seeks dismissal of

Benchmark's request for attorneys fees under the Agreement.  Specifically, the Agreement provides

as follows:

> PTL agrees to hold harmless and indemnify Benchmark, its affiliates and their
> respective directors, officers, shareholders, employees, agents and controlling persons
> (hereinafter "Indemnified Party(s)"), from and against any and all losses, claims,
> damages, liabilities, demands, causes of action, claims for injunctive relief, suits,
> obligations and costs, and any reasonable attorney fees (one legal counsel) hereinafter
> "Indemnifiable Claims") arising out of any services, indemnifiable claims. or
> transactions rendered under this Agreement, unless caused by the willful misconduct
> or negligence of the Indemnified Party(s).  In the event of a claim, and upon request
> by the Indemnified Party(s), PTL agrees to either assume the defense of the
> Indemnified Party(s) for all reasonable attorney fees and litigation costs as they are
> incurred.

(Pl's Opp. Mot. Summ. J., Ex. I.)  Plaintiff responds by arguing that the plain language of this

provision does not carve out an exception for attorneys' fees incurred in a lawsuit between the

contracting parties and, as such, under prevailing jurisprudence, the provision must be deemed to

apply to a litigation between Benchmark and Penn Tank.

Pennsylvania law allows for the recovery of attorneys' fees "from an adverse party to a cause only when provided for by statute, or when clearly agreed to by the parties." Fidelity-Philadelphia Trust Co. v. Phila. Transp. Co., 173 A.2d 109, 113 (Pa. 1961). "Pennsylvania courts require that an indemnity agreement be strictly construed against the party asserting it and that if an agreement is ambiguous it is to be construed 'most strongly' against the party who drafted it." Exelon Generation Co., LLC v. Tugboat DORIS HAMLIN, Civ. A. No. 06-244, 2008 WL 2188333, at *1 (E.D. Pa. May 27, 2008) (citing Kiewit Eastern Co., Inc. v. L & R Const. Co., Inc., 44 F.3d 1194, 1202-3 (3d Cir. 1995). "The intent to indemnify for the particular claim must be clear from the terms of the agreement. Id. (citations omitted).

The parties dispute whether the above indemnification provision applies only to third party claims against Benchmark or whether it extends to first party disagreements between Penn Tank and Benchmark.[16]  The Court, however need not resolve this issue, as we find that the plain language of the indemnification provision precludes an award of attorneys' fees to Benchmark.  As noted above, the provision requires indemnification of, *inter alia*, loss, damages, and attorneys fees arising out of services rendered under the Agreement "*unless caused by the willful misconduct or negligence of the Indemnified Party(s) [Benchmark]*."  (Pl.'s Opp. Mot. Summ. J., Ex. I.)  Any losses suffered by Benchmark in this case have resulted directly from its own failure, as both a negotiator and the party

---

[16]  The Court notes that the most recent jurisprudence from and within the Third Circuit does not limit the scope of such a broadly worded indemnification provision to third party claims, but rather extends it first party claims between the contracting parties.   SBA Network Servs., Inc. v. Telecom Procurement Servs., Inc., 250 Fed. Appx. 487, 492 (3d Cir. 2007); Waynesborough Country Club of Chester County v. Diedrich Niles Bolton Architects, Inc., Civ. A. No. 07-155, 2008 WL 4916029, at *4-5 (E.D. Pa. Nov. 12, 2008).

drafting the Agreement, to bargain for payment of a success fee or other compensation in the event that no transaction is consummated by Penn Tank.  To read the provision any other way would permit Benchmark to recover in any lawsuit brought by it against Penn Tank regardless of the underlying merits.  Accordingly, the Court denies this claim.

## V.      CONCLUSION

In sum, the Court finds no genuine issue of material fact precluding entry of summary judgment in this case.  On its face, and as a matter of law, the Agreement at issue neither required Defendant to close on a transaction nor provided for payment to Benchmark upon production of a ready, willing, and able buyer.  Moreover, Plaintiff cannot circumvent its failure to negotiate any such provision into the Agreement by reliance on the covenant of good faith and fair dealing.  Even if it could, it has failed to substantiate its claim for breach of this implied covenant with any evidentiary support upon which a jury could return a verdict in its favor.  Finally, the plain language of the Agreement forecloses an award of attorneys' fees to Penn Tank.  Therefore, the Court grants summary judgment in favor of Benchmark and against Penn Tank.

An appropriate order follows:

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE BENCHMARK GROUP, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENN TANK LINES, INC., | : | NO.  07-2630 |
| | : | |
| Defendant. | : | |

**ORDER**

**AND NOW**, this *8th* day of *April* 2009, upon consideration of the Motion for Summary

Judgment by Defendant Penn Tank Lines, Inc., (Docket No. 31), Plaintiff The Benchmark Group,

Inc.'s Response (Docket No. 35), Defendant's Reply Brief (Docket No. 37), and Plaintiff's Sur-reply

Brief (Docket No. 39), and upon conducting oral argument on this Motion on March 26, 2009,  it is

hereby **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED.**

**JUDGMENT IS ENTERED** in favor of Defendant Penn Tank Lines, Inc. and against

Plaintiff The Benchmark Group, Inc.

This case is **CLOSED**.

BY THE COURT:

 *s/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.